**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JASON LEWIS, et al., on behalf of themselves and all others similarly situated, | Case No. CV 16-3557 FMO (AGRx) |
| Plaintiffs, | **ORDER RE: MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| v. | |
| GREEN DOT CORPORATION, et al., | |
| Defendants. | |

Having reviewed and considered all the briefing filed with respect to Plaintiffs' Amended Motion for Preliminary Approval of Class Action Settlement (Dkt. 90, "Motion") and the oral argument presented at the hearing on April 13, 2017, the court concludes as follows.

**INTRODUCTION**

On May 22, 2016, Jason Lewis ("Lewis"), Danielle Hall ("Hall") and JC Montgomery ("Montgomery") filed a class action complaint against Green Dot Corporation ("Green Dot Corp"), Green Dot Bank ("Green Dot Bank" and together with Green Dot Corp, "Green Dot defendants"), MasterCard Incorporated ("MasterCard Corp."), and MasterCard International Incorporated ("MasterCard" and together with MasterCard Corp., the "MasterCard defendants") (collectively "defendants"), asserting claims arising from a service disruption from May 14, 2016, through May 22, 2016 ("Service Disruption"), as a result of Green Dot's conversion to a new processing company. (See Dkt. 1, Lewis Complaint) ("Lewis Action").

On June 10, 2016, Kathleen Crook ("Crook"), filed a similar class action against the same

defendants.  The Crook case was transferred to this court as a related case and, on July 14, 2016, the court consolidated the actions.  (See Dkt. 63, Order re: Consolidation).  On September 9, 2016, Lewis, Hall, and Justin Thornton ("Thornton") (collectively, "plaintiffs") filed a consolidated complaint ("CC") asserting claims for:  (1) negligence; (2) unjust enrichment; (3) breach of contract; (4) conversion; (5) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq.; (6) violation of California's Unfair Business Practices Act ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; and (7) breach of bailment contract.  (See Dkt. 70, CC at ¶¶ 65-124).  While the negligence claim is asserted against all defendants, the remaining claims are asserted only against the Green Dot defendants.  (See id.).

The parties reached a settlement in October 2016.  (See Dkt. 76-8, Declaration of John A. Yanchunis ("Yanchunis Decl.") at ¶¶ 11-14).  However, at the January 12, 2017, hearing on plaintiffs' initial motion for preliminary approval, the court expressed concerns regarding the settlement.  (See Dkt. 83, Court's Order of January 12, 2017; see also Dkt. 90-2, Supplemental Declaration of John A. Yanchunis ("Yanchunis Supp. Decl.") at ¶ 4).  Thereafter, plaintiffs filed the operative Second Amended Complaint, ("SAC"), asserting the same claims for relief against the same defendants, (see Dkt. 89, FAC), and on February 13, 2017, following renewed negotiations and a revised settlement, (see Dkt. 90-2, Yanchunis Supp. Decl. at ¶ 5), plaintiffs filed the instant Motion.  (See Dkt. 90, Motion).

On April 21, 2017, plaintiffs filed revised notice documents to address the court's concerns expressed at the April 13, 2017, hearing.  (See Dkt. 98, Court's Order of April 13, 2017; Dkt. 99, Plaintiff's Notice of Revised Notice Documents ("Notice")).

In their Motion, plaintiffs seek an order:  (1) preliminarily approving the proposed settlement; (2) certifying the proposed settlement class; (3) appointing John A. Yanchunis of Morgan & Morgan Complex Litigation Group, Richard D. McCune and Joseph G. Sauder of McCune Wright Arevalo LLP, Jean Sutton Martin of Law Offices of Jean Sutton Martin PPLC, and Daniel C. Girard and Linh G. Vuong of Girard Gibbs LLP as class counsel; (4) approving and ordering dissemination of the proposed class notice and forms; and (5) scheduling a final approval hearing.  (Dkt. 90, Motion at 4-5).

## **BACKGROUND**

This case arises from a service disruption that affected Green Dot Prepaid Cards. Plaintiffs allege that each class member had a Green Dot Prepaid Card, which is a prepaid debit card issued and serviced through Green Dot. (See Dkt. 89, FAC at ¶¶ 1, 32, 40, 46). As a prepaid debit card, account holders must add or "load" funds to their account in order to use the card. (Id. at ¶ 18). The card can be used in the same manner and places as other debit cards. (Id. at ¶ 19). The Green Dot Prepaid Cards also allow account holders to elect to have their employment wages directly deposited to the card. (Id. at ¶ 20). An advertised feature of the Green Dot Prepaid Cards is that such funds will be available to the account holder the day the transfer from the employer is made, "which may be up to two days earlier than the availability of direct transfers of payroll funds to a traditional banking account." (Id.). Green Dot charges account holders fees, such as monthly fees, ATM withdrawal fees, transaction fees, and balance inquiry fees. (Id. at ¶ 21).

Green Dot entered into an agreement with MasterCard pursuant to which MasterCard was to become the new processing services provider for Green Dot. (See Dkt. 89, FAC at ¶ 22). The migration process was to be implemented in four waves. (Id.). "Wave Three" was to occur over a 12-hour period beginning on May 14, 2016, at 7:00 p.m. EDT. (Id. at ¶ 23). Prior to the implementation of Wave Three, Green Dot Prepaid Card customers whose accounts would be included in Wave Three received notice that they would be unable to access their accounts for funds or information during the 12-hour period beginning on May 14, 2016.[1] (Id. at ¶ 24).

However, the loss of access to Green Dot accounts "lasted significantly longer than the expected 12-hour period for some Green Dot Prepaid Card customers." (Dkt. 89, FAC at ¶ 26). Approximately 58,600 customers whose accounts were included in Wave Three "experienced a

---

[1]  Of the accounts included in Wave Three, 93% were WalMart MoneyCard-branded cards and seven percent were Green Dot-branded cards, both issued by Green Dot. (See Dkt. 90-3, Supplemental Declaration of Teresa Watkins in Support of Motion for Preliminary Approval of a Class Action Settlement ("Watkins Supp. Decl.") at ¶ 4; Dkt. 89, FAC at ¶ 25).

longer than anticipated disruption in service for portions of the period of time between May 15, 2016 and May 22, 2016."[2] (Id.).

On May 18, 2016, defendants announced that access had been restored and that the only service affected during the disruption was balance inquiries. (See Dkt. 89, FAC at ¶ 27). However, card holders reported a larger impact on social media. (Id.; see also id. at ¶ 28) (reproduction of complaints posted on Facebook). During the Service Disruption, card holders "lacked access to their funds, causing hardship, including the inability to pay for basic necessities like food, rent, electricity and gas. Additionally, customers were unable to pay their household bills, resulting in late fees being assessed." (Id. at ¶ 28).

On May 22, 2016, Green Dot posted an announcement on its Facebook page stating that all issues had been resolved. (See Dkt. 89, FAC at ¶ 29). However, plaintiffs allege that many cardholders, including plaintiffs, still had not regained access. (Id.). For instance, Lewis alleges that he did not have access to his account for at least a week.[3] (Id. at ¶ 38). As a result, he was late on his rent payment, was charged an $82 late fee, and was threatened with eviction. (Id. at ¶ 39). Lewis was also late on his car payment, and was assessed a late fee of $18. (Id.). In order to pay other expenses, Lewis had to "pawn[] his television and watch[,]" and had to borrow money from friends. (Id. at ¶ 39). Hall's inability to access her funds for a week resulted in a late car insurance payment, for which she was assessed a $20 late fee. (See id. at ¶¶ 43-45). Finally, Thornton was unable to access his funds until the end of May, 2016, (id. at ¶ 54), and was unable to pay his auto insurance, resulting in termination. (Id. at ¶ 52). Thornton was also forced to

---

[2]   Plaintiffs allege that this was not the first such incident involving the MasterCard defendants. (Dkt. 89, FAC at ¶ 31). In October 2015, they experienced a similar extended service disruption related to another prepaid debit card called RushCard. (Id.). In that case, rather than the expected five-hour outage on October 12, 2015, customers experienced disruptions for varying lengths of time through the following weeks until October 31, 2015. (Id.).

[3]   Plaintiffs allege that a few days prior to the planned outage, Lewis called Green Dot to question suspicious charges, which turned out to be legitimate, but a miscommunication during the call resulted in Lewis's account being cancelled. "A new card was to be issued[]" before the conversion; however, the conversion did not pick up his and other "ghost accounts." (See Dkt. 89, FAC at ¶¶ 33, 37).

borrow $300 from his employer to purchase food.[4]  (Id. at ¶ 53).

Following the January 12, 2017, hearing, the parties "renewed settlement negotiations" and "exchanged multiple proposals and counter-proposals regarding amendments to the [s]ettlement." (See Dkt. 90, Motion at 7; Dkt. 90-2, Yanchunis Supp. Decl. at ¶¶ 4-5).  On February 13, 2017, the parties executed an amended settlement agreement.  (Dkt. 90, Motion at 7).  The parties defined the settlement class as:

> All cardholders, as identified in Green Dot Defendants' business records, who attempted to and were unable to use their Green Dot-issued, MasterCard-processed cards to access or spend their account funds from May 15, 2016 through May 22, 2016 as a result of the Service Disruption.

(Dkt. 90-1, Stipulation of Amended Agreement and Settlement and Release ("Settlement Agreement") at § III.2.; Dkt. 90, Motion at 7).  Excluded from the class are the court, the officers and directors of defendants, persons who have been separately represented by an attorney and entered into a separate settlement agreement, and persons who exclude themselves.  (Dkt. 90-1, Settlement Agreement at § III.3.).

Pursuant to the settlement, defendants have already provided two benefits to compensate some class members for inconveniences and losses caused by the Service Disruption.  First, most class members with an active Green Dot account received a two-month fee holiday ("Fee Holiday") during which they were not assessed any monthly maintenance fees.  (See Dkt. 90-1, Settlement Agreement at § IV.1.(a).; Dkt. 90, Motion at 8).  At the time of the Third Wave, the monthly maintenance fee for the affected cards "fell within a range of $3.00-$7.95 depending on the card[.]" (Dkt. 90-1, Settlement Agreement at § IV.1.(a).).  Second, class members who had an active Green Dot account in May and June 2016, "received credits to their accounts in the amount of $50.00 each [("Courtesy Credit")]."  (Id. at § IV.1.(b).).  Green Dot issued approximately 58,275 Courtesy Credits, for a total of $2,913,750.  (Id.).  Through the Fee Holiday and Courtesy Credits,

---

[4]  In the Motion, plaintiffs state that "information exchanged between counsel . . . confirmed that JC Montgomery and Kathleen Crook were not affected by the Service Disruption as they believed and they elected not to proceed as class representatives."  (Dkt. 90, Motion at 6 n. 2).

Green Dot has provided more than $3.3 million to class members.[5]  (Id. at § IV.1.(c).).

Defendants will also provide prospective relief to class members as follows:

• Tier 1 Claims – Fee Holiday Extension:  Each settlement class member will be entitled to a one-month extension of the Fee Holiday.  (Dkt. 90-1, Settlement Agreement at § IV.2.(a).).  This benefit may be provided, at Green Dot's election, via account credits, checks, or funds.  (Id.).  This benefit is automatic and will not require class members to file claims.  (Id.).

• Tier 2 Claims – Payment for Losses Without Documentation:  Class members "who attempted to and were unable to use their Prepaid Cards to access or spend their account funds from May 15, 2016 through May 22, 2016 and who claim to have suffered a financial or other loss as a result of the Service Disruption but do not have or do not wish to provide Reasonable Documentation will be eligible for a payment up to $100.00."[6]  (Dkt. 90-1, Settlement Agreement at § IV.3.(a).).  However, any prior payments received by a class member from Green Dot "as restitution for the Service Disruption, other than the Fee Holiday, will be offset against the $100.00 (or lesser) payment."  (Id. at § IV.3.(b).).

• Tier 3 Claims – Payment for Substantiated Losses:  Class members "who attempted to and were unable to use their Prepaid Cards to access or spend their account funds from May 15, 2016 through May 22, 2016 and who claim to have suffered a financial or other loss as a result of the Service Disruption and who provide Reasonable Documentation of Substantiated Losses will be eligible for a payment of the lesser of the amount of such loss

---

[5]  Approximately $1.1 million has also been provided in "individualized courtesy credits," a portion of which went to individuals who were represented by counsel, and thus fall outside the class definition.  (Dkt. 90-1, Settlement Agreement at § IV.1.(c).).

[6]  "Reasonable Documentation" is defined as "documentation tending to establish Substantiated Losses fairly traceable to the Service Disruption[, including for instance] receipts, account statements, letters or records from employers confirming payments or losses, and letters from landlords confirming payments or losses."  (Dkt. 90-1, Settlement Agreement at § II.19.).  "Substantiated Losses" is defined as "financial or other losses reasonably traceable to the Service Disruption for which the [class member] submits Reasonable Documentation.  Non-exhaustive examples of Substantiated Losses include late fees, declined payment fees, utility disruption or restoration fees, loss of housing, and lost wages."  (Id. at § II.27.).

or $750.00." (Dkt. 90-1, Settlement Agreement at § IV.4.(a).).  However, any prior payments received by the class member from Green Dot "as restitution for the Service Disruption, other than the Fee Holiday, will be offset against the $750.00 (or lesser) payment." (Id. at § IV.4.(b).).

The Tier 2 claims are subject to an aggregate amount not to exceed $2 million ("Tier 2 Maximum").  (Dkt. 90-1, Settlement Agreement § III.3.(c).).  If Tier 2 claims exceed the Tier 2 Maximum, each claim will be reduced on a pro rata basis.  (Id.).  If such claims do not reach the Tier 2 Maximum, the "difference between the claimed amount and the Tier 2 Maximum shall be made available to expand the Tier 3 Maximum[.]" (Id.).  The Tier 3 claims are subject to an aggregate amount not to exceed $1.5 million, "plus the rollover from Tier 2, if any," ("Tier 3 Maximum"), and if valid claims exceed the Tier 3 Maximum, each claim will be reduced on a pro rata basis.  (Id. at § IV.4(c).).

"Combined across Tiers 2 and 3, Defendants agree to pay a guaranteed minimum of $1,500,00.00 ("Minimum Payment").  If an insufficient number of valid and timely claims are submitted and paid to exhaust the Minimum Payment Amount . . . then the remaining funds shall be distributed to the following cy pres recipient, subject to Court approval: Consumer Action, a non-profit corporation that provides financial advocacy and education to consumers nationwide." (Dkt. 90-1, Settlement Agreement at § IV.5.).

"Under Tier 2 and Tier 3, Defendants shall have no obligation to make payments above the Minimum Payment unless the total value of validly filed claims exceeds the Minimum Payment. In such case, Defendants shall pay the amount of the validly-filed claims and no more.  In no event shall Defendants' payment obligations under Tier 2 exceed the Tier 2 Maximum, and in no event shall Defendants' payment obligations under Tier 3 exceed the Tier 3 Maximum." (Dkt. 90-1, Settlement Agreement at § IV.5.).

Class members may seek payment under Tier 2 or Tier 3 by filing a valid and timely claim form, which will be available on the settlement website as well as from the claims administrator. (Dkt. 90-1, Settlement Agreement at § IV.7.(b).-(c).).  The claims will be "subject to a two-part verification process."  (Id. at § IV.7.(d).-(e).).  With respect to both Tier 2 and Tier 3, class

members will be required to "submit a brief explanation, under penalty of perjury, as to how the Service Disruption caused them a loss and as to the amount of loss claimed as a result of the Service Disruption." (Id.).  Green Dot, then, will "confirm according to its business records that the [class member] held a Green Dot-issued, MasterCard-processed card and attempted to and was unable to use or activate such card as a direct result of the Service Disruption." (Id. at § IV.7.(d).). Tier 3 claims will additionally require submission of "Reasonable Documentation" to support the claims. (Id. at § IV.7.(e).).  If such claims are submitted without Reasonable Documentation, the Settlement Administrator will send a notice to the claimant explaining the deficiency and providing 30 days to submit adequate documentation to support the claim.  (See id. at § IV.7.(g).).  If Reasonable Documentation is not provided, the Tier 3 claim will be processed as a Tier 2 claim. (Id.).

"All costs associated with or incurred by the Settlement Administrator shall be borne by and separately paid by Defendants[,]" including "costs and expenses associated with providing notice" to the class.  (See Dkt. 90-1, Settlement Agreement at §§ VI.3., VII.8.).  According to plaintiffs, the estimated cost of claims administration is approximately $145,350.  (See Dkt. 90, Motion at 12). Finally, defendants will not oppose an application for an award of attorney's fees and costs in the amount of $750,000, (see Dkt. 90-1, Settlement Agreement at § X.2.), or oppose service awards of $500 for each class representative.  (See id. at § X.1.).

## LEGAL STANDARD

"[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).

I.    CLASS CERTIFICATION.

At the preliminary approval stage, the court "may make either a preliminary determination that the proposed class action satisfies the criteria set out in Rule 23 or render a final decision as

to the appropriateness of class certification."[7] <u>Smith v. Wm. Wrigley Jr. Co.</u>, 2010 WL 2401149, *3 (S.D. Fla. 2010) (internal citation omitted); <u>see also</u> <u>Sandoval v. Roadlink USA Pac., Inc.</u>, 2011 WL 5443777, *2 (C.D. Cal. 2011) (citing <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 620, 117 S.Ct. 2231, 2248 (1997)) ("Parties seeking class certification for settlement purposes must satisfy the requirements of Federal Rule of Civil Procedure 23[.]").  "A court considering such a request should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement context.'"  <u>Sandoval</u>, 2011 WL 5443777, at *2 (quoting <u>Amchem</u>, 521 U.S. at 620, 117 S.Ct. at 2248).  "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  <u>Amchem</u>, 521 U.S. at 620, 117 S.Ct. at 2248.

A party seeking class certification must first demonstrate that:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

"Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)."  <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548 (2011).  Rule 23(b) is satisfied if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would

---

[7] All "Rule" references are to the Federal Rules of Civil Procedure.

substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1)-(3).

The party seeking class certification bears the burden of demonstrating that the proposed class meets the requirements of Rule 23. See Dukes, 564 U.S. at 350, 131 S.Ct. at 2551 ("Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").  However, courts need not consider the Rule 23(b)(3) considerations regarding manageability of the class action, as settlement obviates the need for a manageable trial.  See Morey v. Louis Vuitton N. Am., Inc., 2014 WL 109194, *12 (S.D. Cal. 2014) ("[B]ecause this certification of the Class is in connection with the Settlement rather than litigation, the Court need not address any issues of manageability that may be presented by certification of the class proposed in the Settlement Agreement."); Rosenburg v. I.B.M., 2007 WL 128232, *3 (N.D. Cal. 2007) (discussing "the elimination of the need, on account of the [s]ettlement, for the Court to consider any potential trial

1    manageability issues that might otherwise bear on the propriety of class certification").

2    II.    FAIRNESS OF CLASS ACTION SETTLEMENT.

3          Rule 23 provides that "the claims, issues, or defenses of a certified class may be settled

4    . . . only with the court's approval." Fed. R. Civ. P. 23(e).  "The primary concern of [Rule 23(e)]

5    is the protection of th[e] class members, including the named plaintiffs, whose rights may not have

6    been given due regard by the negotiating parties."  In re Syncor ERISA Litig., 516 F.3d 1095,

7    1101-02 (9th Cir. 2008) (quoting Officers for Justice v. Civil Service Comm'n of the City & Cnty.

8    of San Francisco, 688 F.2d 615, 624 (9th Cir. 1982), cert. denied 459 U.S. 1217 (1983)).

9    Accordingly, a district court must determine whether a proposed class action settlement is

10    "fundamentally fair, adequate, and reasonable."  Staton, 327 F.3d at 959; see Fed. R. Civ. Proc.

11    23(e).  Whether to approve a class action settlement is "committed to the sound discretion of the

12    trial judge."  Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert. denied, Hoffer

13    v. City of Seattle, 506 U.S. 953 (1992) (internal quotation marks and citation omitted).

14          "If the [settlement] proposal would bind class members, the court may approve it only after

15    a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

16    "[S]ettlement approval that takes place prior to formal class certification requires a higher standard

17    of fairness [given t]he dangers of collusion between class counsel and the defendant, as well as

18    the need for additional protections when the settlement is not negotiated by a court designated

19    class representative[.]"  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).  As the

20    Ninth Circuit has observed, "[p]rior to formal class certification, there is an even greater potential

21    for a breach of fiduciary duty owed the class during settlement.  Accordingly, such agreements

22    must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of

23    interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."

24    In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011).

25          Approval of a class action settlement requires a two-step process – a preliminary approval

26    followed by a later final approval.  See West v. Circle K Stores, Inc., 2006 WL 1652598, *2 (E.D.

27    Cal. 2006) ("[A]pproval of a class action settlement takes place in two stages."); Tijero v. Aaron

28    Bros., Inc., 2013 WL 60464, *6 (N.D. Cal. 2013) ("The decision of whether to approve a proposed

class action settlement entails a two-step process.").  At the preliminary approval stage, the court "evaluate[s] the terms of the settlement to determine whether they are within a range of possible judicial approval."  Wright v. Linkus Enters., Inc., 259 F.R.D. 468, 472 (E.D. Cal. 2009).  Although "[c]loser scrutiny is reserved for the final approval hearing[,]" Harris v. Vector Mktg. Corp., 2011 WL 1627973, *7 (N.D. Cal. 2011), "the showing at the preliminary approval stage – given the amount of time, money and resources involved in, for example, sending out new class notices – should be good enough for final approval."  Spann v. J.C. Penney Corp., 314 F.R.D. 312, 319 (C.D. Cal. 2016).  "At this stage, the court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval."  Id. (internal quotation marks omitted); Harris, 2011 WL 1627973, at *7 (same); Cordy v. USS-Posco Indus., 2013 WL 4028627, *3 (N.D. Cal. 2013) ("Preliminary approval of a settlement and notice to the proposed class is appropriate if the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.") (internal quotation marks omitted).

## **DISCUSSION**

I.    CLASS CERTIFICATION.

     A.    Rule 23(a) Requirements.

          1.    **Numerosity**.

The first prerequisite of class certification requires that the class be "so numerous that joinder of all members is impractical[.]"  Fed. R. Civ. P. 23(a)(1).  Although impracticability does not hinge only on the number of members in the putative class, joinder is usually impracticable if a class is "large in numbers."  See Jordan v. Cnty. of Los Angeles, 669 F.2d 1311, 1319 (9th Cir.), vacated on other grounds, 459 U.S. 810 (1982) (class sizes of 39, 64, and 71 are sufficient to satisfy the numerosity requirement); Jimenez v. Domino's Pizza, Inc., 238 F.R.D. 241, 247 (C.D. Cal. 2006) (same).  "As a general matter, courts have found that numerosity is satisfied when

class size exceeds 40 members, but not satisfied when membership dips below 21." Slaven v. BP Am., Inc., 190 F.R.D. 649, 654 (C.D. Cal. 2000); see Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 473 (C.D. Cal. 2012) ("A proposed class of at least forty members presumptively satisfies the numerosity requirement.").

Here, the class is so numerous that joinder is impracticable. The parties estimate that there are approximately 58,600 class members (see Dkt. 90-3, Watkins Supp. Decl. at ¶ 3; Dkt. 90-1, Settlement Agreement at § I.C.), which easily exceeds the minimum threshold for numerosity under Rule 23(a)(1).

### 2. **Commonality**.

The commonality requirement is satisfied if "there are common questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). Commonality requires plaintiffs to demonstrate that their claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see also Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (The commonality requirement demands that "class members' situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.") (internal quotation marks omitted). "The plaintiff[s] must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir. 2013), cert. denied, 135 S.Ct. 53 (2014) (emphasis and internal quotation marks omitted); see Mazza, 666 F.3d at 589 (characterizing commonality as a "limited burden[,]" stating that it "only requires a single significant question of law or fact"). Proof of commonality under Rule 23(a) is "less rigorous" than the related preponderance standard under Rule 23(b)(3). See Mazza, 666 F.3d at 589. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the

class." Hanlon, 150 F.3d at 1019.

Here, the litigation involves common class-wide issues that would drive the resolution of plaintiffs' claims. The common questions, which flow from the Service Disruption, include: whether defendants breached their contracts with class members; whether defendants owed duties to class members and whether those duties were breached; whether defendants' conduct was unfair or unlawful; and whether class members suffered damages. (See Dkt. 90, Motion at 23-24).

        3.    **Typicality**.

"Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted). To demonstrate typicality, plaintiffs' claims must be "reasonably co-extensive with those of absent class members[,]" although "they need not be substantially identical." Hanlon, 150 F.3d at 1020; see Ellis, 657 F.3d at 984 ("Plaintiffs must show that the named parties' claims are typical of the class."). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Ellis, 657 F.3d at 984 (internal quotation marks and citation omitted).

Here, the claims of the representative plaintiffs are typical of the claims of the class. They all held Green Dot Prepaid Cards during the Service Disruption, and therefore their claims arise from the same factual basis and are based on the same legal theories. (See, e.g., Dkt. 89, FAC at ¶¶ 1-3, 67-126). Additionally, the court is not aware of any facts that would subject the class representatives "to unique defenses which threaten to become the focus of the litigation." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

        4.    **Adequacy of Representation**.

"The named Plaintiffs must fairly and adequately protect the interests of the class." Ellis, 657 F.3d at 985 (citing Fed. R. Civ. P. 23(a)(4)). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named

plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Id. (internal quotation marks and citation omitted).  "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." Id.

Here, the proposed class representatives do not appear to have any conflict of interest with the absent class members, as they have no individual claims separate from the class claims. (See, generally, Dkt. 89, FAC at ¶¶ 67-126).  Moreover, as plaintiff Lewis states: "Before this case was filed, I was fully informed of my responsibilities and obligations as a potential class representative." (Dkt. 90-4, Declaration of Plaintiff Jason Lewis in Support of Plaintiffs' Motion for Preliminary Approval of Settlement ("Lewis Decl.") at ¶ 14).  Plaintiffs' counsel adds that plaintiffs have "focused on the advancement of the interests and claims of the Settlement Class over their own interests." (Dkt. 76-8, Yanchunis Decl. at ¶ 8).  In short, "[t]he adequacy-of-representation requirement is met here because Plaintiffs have the same interests as the absent Class Members[.]  Further, there is no apparent conflict of interest between the named Plaintiffs' claims and those of the other Class Members' – particularly because the named Plaintiffs have no separate and individual claims apart from the Class." Barbosa v. Cargill Meat Solutions Corp, 297 F.R.D. 431, 442 (E.D. Cal. 2013).

Finally, the court is satisfied that plaintiffs' counsel are competent and willing to prosecute this action vigorously.  Plaintiffs' counsel request, and the Settlement Agreement provides, that the court appoint as class counsel John A. Yanchunis of Morgan & Morgan Complex Litigation Group; Richard D. McCune and Joseph G. Sauder of McCune Wright Arevalo LLP; Jean Sutton Martin of Law Offices of Jean Sutton Martin PPLC; and Daniel C. Girard and Linh G. Vuong of Girard Gibbs LLP.  (See Dkt. 90, Motion at 5; Dkt. 90-1, Settlement Agreement at §§ II.6-7.).  Yanchunis states that he has "substantial consumer class action experience" and that the "vast majority of [his] practice, which now spans 36 years, has concentrated on complex litigation, including consumer class actions."  (Dkt. 76-8, Yanchunis Decl. at ¶¶ 3-4; see also Dkt. 76-9, Morgan & Morgan Firm Resume).  He adds that the other proposed class counsel "have a wealth of experience in litigating complex class action lawsuits[.]"  (See Dkt. 76-8, Yanchunis Decl. at ¶

23; see also Dkt. 76-10 (firm resumes)).  Based on Yanchunis's representations and the firm resumes attached to his declaration, the court finds that plaintiffs' counsel are competent, and that the adequacy of representation requirement is satisfied.  See Barbosa, 297 F.R.D. at 443 ("There is no challenge to the competency of the Class Counsel, and the Court finds that Plaintiffs are represented by experienced and competent counsel who have litigated numerous class action cases."); Avilez v. Pinkerton Gov't Servs., Inc., 286 F.R.D. 450, 457 (C.D. Cal. 2012) vacated and remanded on other grounds, 595 Fed. Appx. 579 (9th Cir. 2015) ("Defendants do not dispute and the evidence confirms that, as detailed in their declarations, Plaintiff's counsel are experienced class action litigators who have litigated many . . . class actions and have been certified as class counsel in numerous other class actions[.]").

      B.     Rule 23(b) Requirements.

      Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action."  Hanlon, 150 F.3d at 1022 (internal quotation marks omitted).  The rule requires two different inquiries, specifically a determination as to whether:  (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); see Spann, 314 F.R.D. at 321-22.

      1.     **Predominance**.

      "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem, 521 U.S. at 623, 117 S.Ct. at 2249.  "Rule 23(b)(3) focuses on the relationship between the common and individual issues.  When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  Hanlon, 150 F.3d at 1022 (internal quotation marks and citations omitted); see In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 959 (9th Cir. 2009) ("[T]he main concern in the predominance inquiry . . . [is] the balance between individual and common issues.").  Additionally, the class damages must be

sufficiently traceable to plaintiffs' liability case.  See Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1433 (2013).

Here, plaintiffs have demonstrated that "[a] common nucleus of facts and potential legal remedies dominates this litigation."  Hanlon, 150 F.3d at 1022.  As discussed above, see supra at § I.A.2., there are several common questions regarding the Service Disruption, and those common questions predominate over questions affecting individual class members. (See Dkt. 90, Motion at 24-25); Fed. R. Civ. P. 23(b)(3).  As plaintiffs note, their claims focus on defendants' conduct rather than the individual conduct of plaintiffs and class members. (See Dkt. 90, Motion at 24).  In other words, their "claims depend primarily on whether Defendants are liable for the Service Disruption, and thus raise just the sort of predominantly common questions court have found to justify class treatment."  (Id.) (citing Spann, 314 F.R.D. at 322).  Additionally, the relief sought applies to all class members and is traceable to plaintiffs' liability case.  See Comcast, 133 S.Ct. at 1433.

2.  **Superiority**.

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case" and "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." Hanlon, 150 F.3d at 1023. Rule 23(b)(3) provides a list of four non-exhaustive factors relevant to superiority.  See Fed. R. Civ. P. 23(b)(3)(A)-(D).

The first factor considers "the class members' interests in individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  "This factor weighs against class certification where each class member has suffered sizeable damages or has an emotional stake in the litigation."  Barbosa, 297 F.R.D. at 444.  Here, plaintiffs do not assert claims for emotional distress, (see, generally, Dkt. 89, FAC), nor is there any indication that the amount of damages any individual class member could recover is significant or substantially greater than the potential recovery of any other class member.  (See, generally, 90-1, Settlement Agreement). The alternative method of resolution is individual claims for a relatively modest amount of damages, but such claims would likely never be brought, as "litigation costs would dwarf potential

1  recovery." Hanlon, 150 F.3d at 1023; see Leyva v. Medline Indus., Inc., 716 F.3d 510, 515 (9th

2  Cir. 2013) ("In light of the small size of the putative class members' potential individual monetary

3  recovery, class certification may be the only feasible means for them to adjudicate their claims.

4  Thus, class certification is also the superior method of adjudication."); Bruno v. Quten Research

5  Inst., LLC, 280 F.R.D. 524, 537 (C.D. Cal. 2011) ("Given the small size of each class member's

6  claim, class treatment is not merely the superior, but the only manner in which to ensure fair and

7  efficient adjudication of the present action."). In short, "there is no evidence that Class members

8  have any interest in controlling prosecution of their claims separately nor would they likely have

9  the resources to do so." Munoz v. PHH Corp., 2013 WL 2146925, *26 (E.D. Cal. 2013).

10        The second factor to consider is "the extent and nature of any litigation concerning the

11  controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B).  There is

12  no indication that any class member is involved in any other litigation concerning the claims in this

13  case.

14        The third factor is "the desirability or undesirability of concentrating the litigation of the

15  claims in the particular forum[,]" Fed. R. Civ. P. 23(b)(3)(C), and the fourth factor is "the likely

16  difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  As noted above, "[i]n the

17  context of settlement . . . the third and fourth factors are rendered moot and are irrelevant."

18  Barbosa, 297 F.R.D. at 444; see Amchem, 521 U.S. at 620, 117 S.Ct. at 2248 ("Confronted with

19  a request for settlement-only class certification, a district court need not inquire whether the case,

20  if tried, would present intractable management problems, for the proposal is that there be no trial.")

21  (internal citation omitted).

22        The only factor in play here weighs in favor of class treatment.  Further, the filing of

23  separate suits by several thousand class members "would create an unnecessary burden on

24  judicial resources." Barbosa, 297 F.R.D. at 445.  Under the circumstances, the court finds that

25  the superiority requirement is satisfied.

26

27

28

II.   FAIRNESS, REASONABLENESS, AND ADEQUACY OF THE PROPOSED SETTLEMENT.

    A.   The Settlement is the Product of Arm's-Length Negotiations.

"This circuit has long deferred to the private consensual decision of the parties." Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009). The Ninth Circuit has "emphasized" that "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." Id. (internal quotation marks omitted). When the settlement is "the product of an arms-length, non-collusive, negotiated resolution[,]" id., courts afford the parties the presumption that the settlement is fair and reasonable. See Spann, 314 F.R.D. at 324 ("A presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery.") (internal citation omitted); In re Netflix Privacy Litig., 2013 WL 1120801, *4 (N.D. Cal. 2013) ("Courts have afforded a presumption of fairness and reasonableness of a settlement agreement where that agreement was the product of non-collusive arms' length negotiations conducted by capable and experienced counsel.").

Here, there is no evidence of collusion or fraud leading to, or taking part in, the settlement negotiations between the parties. While the parties did not engage in formal discovery, defendants provided "information and data" on a voluntary basis. (See Dkt. 90-2, Yanchunis Supp. Decl. at ¶ 15). Moreover, as noted above, some of the defendants were involved in a similar service disruption involving RushCard, (see Dkt. 89, FAC at ¶ 31), and since plaintiffs' counsel was co-lead counsel in that matter, (see Dkt. 90-2, Yanchunis Supp. Decl. at ¶ 9), the parties had information that could be used to set the amount of the settlement benefits in this matter. (See id. at ¶¶ 7-9). Thus, the parties entered the settlement discussions with a substantial understanding of the factual and legal issues from which they could advocate for their respective positions. See Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1239 (9th Cir. 1998) ("[F]ormal discovery is not a necessary ticket to the bargaining table where the parties have sufficient

1  information to make an informed decision about settlement."); Clesceri v. Beach City Investigations

2  & Protective Services, Inc., 2011 WL 320998, *9 (C.D. Cal. 2011) (same).

3          During the July 15, 2016, settlement meeting, the parties "exchanged offers and

4  counteroffers and negotiated the points of each vigorously." (Dkt. 76-8, Yanchunis Decl. at ¶¶ 11-

5  12).  Following the initial settlement meeting, the parties continued settlement discussions, (see

6  id. at ¶ 13), and on October 6, 2016, reached an agreement in principle regarding the material

7  terms of the proposed settlement.  (See id. at ¶ 14).  As part of the discussions, the parties

8  agreed, to the extent practicable, to model the Settlement Agreement after the settlement in the

9  RushCard action, entitled Fuentes v. UniRush, LLC, Case No. 15-8372 (S.D.N.Y.) ("RushCard

10  Action").  (Id. at ¶ 16; Dkt. 90-2, Yanchunis Supp. Decl. at ¶ 7).  According to plaintiffs' counsel,

11  "[e]very aspect of [the] Settlement Agreement was heavily negotiated, including each aspect of

12  the Settlement Agreement and Exhibits, the release, and the claims process and notice program."

13  (Dkt. 76-8, Yanchunis Decl. at ¶ 15; Dkt. 90-2, Yanchunis Supp. Decl. at ¶ 6).

14          Based on the evidence and record before the court, the court is persuaded that the parties

15  sufficiently investigated and considered their own and the opposing parties' positions.  The parties

16  had a sound basis for measuring the terms of the settlement against the risks of continued

17  litigation, and there is no evidence that the settlement is "the product of fraud or overreaching by,

18  or collusion between, the negotiating parties[.]"  Rodriguez, 563 F.3d at 965 (quoting Officers for

19  Justice, 688 F.2d at 625).

20          B.     The Amount Offered In Settlement Falls Within a Range of Possible Judicial

21                 Approval and is a Fair and Reasonable Outcome for Class Members.

22          1.     **Recovery for Class Members.**

23          The settlement is fair, reasonable, and adequate, particularly when viewed in light of the

24  litigation risks in this case.  As described above, class members with an active Green Dot account

25  have already received a Fee Holiday, and certain class members have received a Courtesy Credit.

26  (See Dkt. 90-1, Settlement Agreement at §§ IV.1.(a).-(b).).  The parties value such benefits at $3.3

27  million.  (Id. at § IV.1.(c).).  These past benefits do not include the approximate $1.1 million that

28  defendants have provided in "individualized courtesy credits[,]" some of which were paid to

1  individuals who were represented by counsel and thus not a part of the class.  (See id. at  §

2  IV.1.(c).).

3  Prospective relief to the class includes:  a one-month automatic extension of the Fee

4  Holiday, (Dkt. 90-1, Settlement Agreement at § IV.2.(a).), and payment for undocumented losses

5  up to $100 (less any prior payments), with the submission of a claim form; (id. at § IV.3.(a).-(b).).

6  or payment for documented losses up to $750.00 (less any prior payments), with the submission

7  of a claim form and documentation evidencing the loss.  (Id. at § IV.4.(a).- (b).).  If Tier 2 claims

8  exceed the Tier 2 Maximum, each claim will be reduced on a pro rata basis.  (Id. at § IV.3.(c).).

9  However, if the Tier 2 claims do not reach the Tier 2 Maximum, the "difference between the

10 claimed amount and the Tier 2 Maximum shall be made available to expand the Tier 3

11 Maximum[.]"  (Id. § IV.3(c).).  The Tier 3 claims are subject to the Tier 3 Maximum plus any

12 rollover from Tier 2, and if claims exceed that amount, each claim will be reduced on a pro rata

13 basis.  (Id. § IV.4.(c).).  Moreover, defendants agree to pay a $1.5 million Minimum Payment and,

14 if valid claims do not exhaust the Minimum Payment amount, then the remaining funds will be

15 distributed to a cy pres recipient.  (Id. at § IV.5.)

16 Plaintiffs state that the settlement "provides immediate and significant benefits for

17 Settlement Class Members that they otherwise may not receive [and] would provide [them] with

18 virtually everything Plaintiffs asked for in the [FAC]."  (Dkt. 90, Motion at 17).  According to

19 plaintiffs, the settlement has a "value of up to $8,100,000 (including the more than $3.3 million

20 already provided through the Fee Holiday and the Courtesy Credit, the additional $1.1 million in

21 individualized courtesy credits (understanding that a portion of these monies went to individuals

22 represented by counsel and, thus fall outside the class definition), the expected $250,000 value

23 for Tier 1 awards, and the range of $1.5-3.5 million for Tier 2 and Tier 3 claims) [and] is substantial

24 by any measure[.]"  (Id. at 21; see also Dkt. 90-2, Yanchunis Supp. Decl. at ¶ 13 ("The Settlement

25 makes available up to $8.1 million in benefits to the Settlement Class[.]").   Under the

26 circumstances, the court finds that the settlement confers an adequate recovery for plaintiffs and

27 the class members. See, e.g., In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000)

28 (ruling that the "[s]ettlement amount of almost $2 million was roughly one-sixth of the potential

recovery, which, given the difficulties in proving the case, [was] fair and adequate"); <u>Rodriguez</u>, 563 F.3d at 964 (affirming settlement approval where the settlement represented 30% of the damages estimated by the class expert); <u>Linney</u>, 151 F.3d at 1242 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (internal quotation marks and citation omitted).

The settlement here is even more compelling given the substantial litigation risks in this case.  As plaintiffs acknowledge, "continued litigation against Defendants posed significant risks that made any recovery uncertain."  (Dkt. 90, Motion at 18).  Significantly, there was a risk that defendants would prevail in connection with their contention that all claims should be submitted to individual arbitration.  (<u>Id.</u>; <u>see also</u> Dkt. 76-8, Yanchunis Decl. at ¶ 9 ("During the investigative stage of this case, we discovered that affected consumers who make up the Settlement Class had agreed to arbitration in the event they pursued claims against Defendants."); Dkt. 90-2, Yanchunis Supp. Decl. at ¶ 10 (noting litigation risks "particularly in light of an arbitration agreement")).  Plaintiffs also weighed the "difficulty in proving and calculating [] damages" and "the attendant risks and uncertainty of litigation . . . as well as the difficulties and delays inherent in such litigation including the challenges to certification of a class[.]"  (Dkt. 90-2, Yanchunis Supp. Decl. at ¶ 10).  Through the settlement, class members will receive "prompt relief."  (<u>Id.</u>).  In short, the risks of continued litigation are formidable, and the court takes these real risks into account.  Weighed against those risks, and coupled with the delays associated with continued litigation, the settlement's benefits to the class falls within the range of reasonableness.

2.    **Release of Claims**.

Beyond the value of the settlement, potential recovery at trial, and inherent risks in continued litigation, courts also consider whether a class action settlement contains an overly broad release of liability.  <u>See</u> 4 <u>Newberg on Class Actions</u> § 13:15, at p. 326 (5th ed. 2014) ("Beyond the value of the settlement, courts have rejected preliminary approval when the proposed settlement contains obvious substantive defects such as . . . overly broad releases of liability.");  <u>see</u>, <u>e.g.</u>, <u>Fraser v. Asus Computer Int'l</u>, 2012 WL 6680142, *3 (N.D. Cal. 2012)

(denying preliminary approval of proposed settlement that provided defendant a "nationwide blanket release" in exchange for payment "only on a claims-made basis," without the establishment of a settlement fund or any other benefit to the class).

Here, plaintiffs and class members who do not exclude themselves from the settlement agree to release "any and all claims . . . whether known or unknown, contingent or absolute, existing or potential, suspected or unsuspected, disclosed or undisclosed, matured or unmatured . . . that have been or could have been asserted, or in the future might be asserted, in the Actions or in any court, tribunal or proceeding by or on behalf of the Named Plaintiffs, any and all of the members of the Settlement Class . . . against any or all of the Released Parties, which Named Plaintiffs or any member of the Settlement Class ever had, now has, or hereinafter may have, by reason of, resulting from, arising out of, relating to, or in connection with, the allegations, facts, events, transactions, acts, occurrences, statements, representations, omissions, or any other matter, thing or cause whatsoever, or any series thereof, embraced, involved, set forth or otherwise related to the alleged claims or events in the Actions or the Service Disruption." (Dkt. 90-1, Settlement Agreement at § II.20.; id. at § IX.). "The Released Claims do not include any claims arising from or relating to any conduct by Defendants after the date the Agreement [was] executed." (Id. at § IX.2.). With the understanding that, under the release, the settlement class members are not giving up claims unrelated to those asserted in this action, the court finds that the release adequately balances fairness to absent class members and recovery for plaintiffs with defendants' business interest in ending this litigation with finality. See, e.g., Fraser, 2012 WL 6680142, at *4 (recognizing defendant's "legitimate business interest in 'buying peace' and moving on to its next challenge" as well as the need to prioritize "[f]airness to absent class member[s]").

C.     The Settlement Agreement Does Not Improperly Grant Preferential Treatment to the Class Representatives.

"Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit." Radcliffe v. Experian Info. Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013). The Ninth Circuit has instructed "district courts to scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." Id. The court must examine

1  whether there is a "significant disparity between the incentive awards and the payments to the rest

2  of the class members" such that it creates a conflict of interest.  See id. at 1165.  "In deciding

3  whether [an incentive] award is warranted, relevant factors include the actions the plaintiff has

4  taken to protect the interests of the class, the degree to which the class has benefitted from those

5  actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."  Cook

6  v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998).

7          The Settlement Agreement provides that class counsel will petition the court for service

8  awards of up to $500 per class representative as compensation "for their efforts in the litigation

9  and commitment on behalf of the Settlement Class[.]"  (Dkt. 90-1, Settlement Agreement at §

10  X.1.).  It further provides that "[n]either Class Counsel's application for, nor any individual's

11  entitlement to, a Service Award shall be conditioned in any way upon such individual's support for

12  this Agreement."  (Id.).

13          Here, it is clear that the settlement does not improperly grant preferential treatment to the

14  class representatives.  As an initial matter, the $500 incentive award per class member is

15  presumptively reasonable.  See Dyer v. Wells Fargo Bank, N.A., 303 F.R.D. 326, 335 (N.D. Cal.

16  2014) (finding an incentive award of $5,000 presumptively reasonable).  Further, the record

17  reflects that the class representatives have taken on responsibility in litigating this case, and the

18  class has benefitted from the time and effort they spent doing so.  (See, e.g., Dkt. 90-4, Lewis

19  Decl. at ¶¶ 15-16 (describing participation in this litigation and hours spent); Dkt. 90-4, Declaration

20  of Danielle Hall in Support of Plaintiffs' Motion for Preliminary Approval of Settlement ("Hall Decl.")

21  at ¶ 4 (similar); Dkt. 90-4, Declaration of Justin Thornton in Support of Plaintiffs' Motion for

22  Preliminary Approval of Settlement ("Thornton Decl.") at ¶¶ 5-6 (similar)).

23          Plaintiffs state that they have reviewed and approve the settlement in this action.  (See Dkt.

24  90-4, Lewis Decl. at ¶ 17; see also Dkt. 90-4, Hall Decl. at ¶ 5; Dkt. 90-4, Thornton Decl. at ¶ 5).

25  In short, because the parties agree that the settlement shall remain in force regardless of any

26  incentive awards and the amount of the awards are presumptively reasonable, the court is

27  persuaded that there is no conflict of interest between the named plaintiffs and absent class

28  members.

1          D.    <u>Proposed Class Notice and Notification Procedures</u>.

2          Upon a settlement of a certified class, "[t]he court must direct notice in a reasonable

3  manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

4  Federal Rule of Civil Procedure 23(c)(2) requires the "best notice that is practicable under the

5  circumstances, including individual notice" of particular information. <u>See</u> Fed. R. Civ. P.

6  23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

7          A class action settlement notice "is satisfactory if it generally describes the terms of the

8  settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

9  forward and be heard." <u>Churchill Vill., LLC v. Gen. Elec.</u>, 361 F.3d 566, 575 (9th Cir.), <u>cert.</u>

10  <u>denied</u>, 543 U.S. 818 (2004) (internal quotation marks omitted). "The standard for the adequacy

11  of a settlement notice in a class action under either the Due Process Clause or the Federal Rules

12  is measured by reasonableness." <u>Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96, 113 (2d

13  Cir.), <u>cert. denied</u>, 544 U.S. 1044 (2005). Settlement notices must "fairly apprise the prospective

14  members of the class of the terms of the proposed settlement and of the options that are open to

15  them in connection with the proceedings." <u>Weinberger v. Kendrick</u>, 698 F.2d 61, 70 (2d Cir. 1982),

16  <u>cert. denied</u>, 464 U.S. 818 (1983) (internal quotation marks and brackets omitted); <u>see</u> <u>Trotsky v.</u>

17  <u>Los Angeles Fed. Sav. & Loan Ass'n.</u>, 48 Cal.App.3d 134, 151-52 (1975) (same);  <u>Wershba v.</u>

18  <u>Apple Computer, Inc.</u>, 91 Cal.App.4th 224, 252 (2001) ("As a general rule, class notice must strike

19  a balance between thoroughness and the need to avoid unduly complicating the content of the

20  notice and confusing class members."). The notice should provide sufficient information to allow

21  class members to decide whether they should accept the benefits of the settlement, opt out and

22  pursue their own remedies, or object to its terms. <u>See</u> <u>Wershba</u>, 91 Cal.App.4th at 251-52.

23  "[N]otice is adequate if it may be understood by the average class member." 4 <u>Newberg on Class</u>

24  <u>Actions</u> § 11:53, at p. 167 (4th ed. 2013).

25          Here, the notice program consists of two components: (1) Mail Notice and (2) Notice on

26  the Settlement Website, including a short form and long form notice. (Dkt. 90-1, Settlement

27  Agreement at § VII.1.). The Mail Notice describes the nature of the action, including the class

28  claims. (<u>See</u> Dkt. 99-1, Revised Proposed Mail Notice ("Mail Notice") at 1); <u>see</u> Fed. R. Civ. P.

23(c)(2)(B)(i) & (iii).  The class definition is conspicuously included on the first page of the Mail Notice, so that individuals clearly understand who is included.  (See Dkt. 99-1, Mail Notice at 1) ("Members of the Settlement Class are all cardholders, as identified in Green Dot Defendants' business records, who attempted to and were unable to use their Green Dot-issued, MasterCard-processed cards to access or spend their account funds from May 15, 2016 through May 22, 2016 as a result of the Service Disruption."); see also Fed. R. Civ. P. 23(c)(2)(B)(ii).  The Mail Notice explains the benefits of the settlement, (see Dkt. 99-1, Mail Notice at 1), and what class members need to do to obtain each of the available types of relief.  (See id. at 2).  It includes an explanation laying out the class members' options under the settlement, i.e., they may exclude themselves, object, or do nothing.  (See id. at 2); see also Fed. R. Civ. P. 23(c)(2)(B)(v)-(vi).  If class members want to keep their right to sue defendants related to the Service Disruption, they must exclude themselves by downloading an exclusion form from the settlement website and mailing it to the Settlement Administrator.  (See Dkt. 99-1, Mail Notice at 2).  The Mail Notice explains that all class members who do not exclude themselves will release any claims that relate to the Service Disruption.  (See id.); see also Fed. R. Civ. P. 23(c)(2)(B)(vii).  Also, if class members choose to object to the settlement, they may do so by submitting written objections to the court, and they may attend the Final Fairness Hearing with or without an attorney.  (See id.); see also Fed. R. Civ. P. 23(c)(2)(B)(iv).  The Mail Notice explains that class members may not object to the settlement if they exclude themselves.  (See Dkt. 99-1, Mail Notice at 2).  Information regarding the final approval hearing is also included.  (See Id.).  Finally, the Mail Notice directs class members to the settlement website to get more information about the settlement; learn about the Fee Holiday and Courtesy Credits; review the Settlement Agreement and additional notice information; and complete or download a Claim Form.  (See id. at 1-2).

The website notices provide more information about the settlement.  The Long Form Notice describes the nature of the action, including the class claims and that defendants deny they are or can be held liable for the claims made in the action.  (See Dkt. 99-3, Revised Long Form Notice ("Long Form Notice") at 1); see also Fed. R. Civ. P. 23(c)(2)(B)(i) & (iii).  The class definition is conspicuously included on the first page in a section entitled, "How do I know if I am in the

1   Settlement Class?" (See Dkt. 99-3, Long Form Notice at 1 & 5); see also Fed. R. Civ. P.

2   23(c)(2)(B)(ii).  The Long Form Notice also explains the terms of the settlement, including the

3   benefits class members have already received and will receive.  (See Dkt. 99-3, Long Form Notice

4    at 1-2, 5-8).  It explains what class members need to do to obtain each of the available types of

5   relief, (see id.), and includes an explanation laying out the class members' options under the

6   settlement, i.e., they may exclude themselves, object, or do nothing.  (See id. at 2-3, 8-10); see

7   also Fed. R. Civ. P. 23(c)(2)(B)(v)-(vi).  Class members may elect to exclude themselves from the

8   settlement by downloading an exclusion form from the settlement website and mailing it (or a

9   letter) to the Settlement Administrator.  (See Dkt. 99-3, Long Form Notice at 8; see also Dkt. 90-1.

10   Settlement Agreement, Exh. E (Exclusion Form)).  Also, if class members choose to object to the

11   settlement, they may do so by submitting their written objections to the court, and they may attend

12   the Final Fairness Hearing with or without an attorney.[8]  (See Dkt. 99-3, Long Form Notice at 9-

13   10); see Fed. R. Civ. P. 23(c)(2)(B)(iv).  The Long Form Notice also explains that all members of

14   the class who do no exclude themselves will not be able to sue defendants about the issues in the

15   case and will be bound by the release included in the Settlement Agreement.  (See Dkt. 99-3,

16   Long Form Notice at 8); see also Fed. R. Civ. P. 23(c)(2)(B)(vii).

17        Based on the foregoing, the court finds that there is no alternative method of distribution

18   that would be more practicable here, or any more reasonably likely to notify the class members.

19   The court further finds that the procedure for providing notice and the content of the class notice

20   constitute the best practicable notice to class members.

21        E.    Summary.

22        In sum, the court's preliminary evaluation of the Settlement Agreement "does not disclose

23   grounds to doubt its fairness[,] . . . such as unduly preferential treatment of class representatives

24   or of segments of the class, or excessive compensation for attorneys, and appears to fall within

25

26        [8]  The Long Form Notice directs class members to indicate in their objections whether the class member is represented by counsel and identify other class actions in which the class
27   member filed an objection within the past five years.  (See Dkt. 99-3, Long Form Notice at 9).  It also explains that class members who object and wish to speak at the Final Fairness Hearing must
28   indicate their intent to do so in their written objections.  (See id. at 9 & 10).

the range of possible approval[.]"  In re Vitamins Antitrust Litig., 2001 WL 856292, *4 (D.D.C. 2001) (quoting Manual for Complex Litigation § 30.41 (3d ed. 1999)); see also Spann, 314 F.R.D. at 323 (same); In re NVIDIA Corp. Derivative Litig., 2008 WL 5382544, *2 (N.D. Cal. 2008) (same).

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1.  Plaintiffs' Amended Motion for Preliminary Approval of Class Action Settlement **(Document No. 90)** is **granted** upon the terms and conditions set forth in this Order.

2.  The court preliminarily certifies the class, as defined in § III.2. of the Stipulation of Amended Agreement and Settlement and Release ("Settlement Agreement") **(Document No. 90-1)** for the purposes of settlement.

3.  The court preliminary appoints plaintiffs Jason Lewis, Danielle Hall, and Justin Thornton as class representatives for settlement purposes.

4.  The court preliminarily appoints John A. Yanchunis of Morgan & Morgan Complex Litigation Group; Richard D. McCune and Joseph G. Sauder of McCune Wright Arevalo LLP; Jean Sutton Martin of Law Offices of Jean Sutton Martin PPLC; and Daniel C. Girard and Linh G. Vuong of Girard Gibbs LLP as class counsel for settlement purposes.

5.  The court preliminarily finds that the terms of the Settlement are fair, reasonable and adequate, and comply with Rule 23(e) of the Federal Rules of Civil Procedure.

6.  The proposed manner of the notice of settlement set forth in the Settlement Agreement constitutes the best notice practicable under the circumstances and complies with the requirements of due process.

7.  The court approves the form, substance, and requirements of the: Mail Notice (Dkt. 99-1); Short Form Notice (Dkt. 99-2); Long Form Notice (Dkt. 99-3); Claim Form (Dkt. 90-1, Settlement Agreement, Exh. A); and Exclusion Form (Dkt. 90-1, Settlement Agreement, Exh. E).

8.  The parties shall carry out the settlement and claims process according to the terms of the Settlement Agreement.

9.  Epiq Systems ("Epiq") is hereby appointed as the Settlement Administrator.  Promptly following entry of this order, Epiq will prepare final versions of the notices, claim, and exclusion

forms, incorporating the relevant dates and deadlines set forth in this Order and the Settlement Agreement, and will commence the notice process, in accordance with the Settlement Agreement. Notice shall be completed no later than **July 13, 2017**.

10. Any class member who wishes to: (a) object to the settlement, including the requested attorney's fees, costs and incentive awards; and/or (b) exclude him or herself from the settlement must file his or her objection to the settlement or request for exclusion (i.e., the Exclusion Form) no later than **September 26, 2017**, in accordance with the Settlement Agreement, Mail Notice, Long Form Notice and/or Exclusion Form.

11. A final approval (fairness) hearing is hereby set for **November 2, 2017,** at **10:00 a.m.** in Courtroom 6D of the First Street Courthouse, to consider the fairness, reasonableness, and adequacy of the Settlement as well as the award of attorney's fees and costs to class counsel, and service awards to the class representatives.

12. Plaintiffs shall file a motion for an award of class representative incentive payments and attorney's fees and costs no later than **August 26, 2017,** and notice it for hearing for the date set forth in paragraph 11 above. Any objection to the motion for an award of class representative incentive payments and attorney's fees and costs, by class members, shall be filed by the deadline set forth in paragraph 10 above. In the event any objections to the motion for an award of class representatives incentive payments and attorney's fees and costs are filed, class counsel shall, no later than **October 12, 2017,** file a reply addressing the objections.

13. Plaintiffs shall, no later than **October 12, 2017,** file and serve a motion for final approval of the settlement and a response to any objections to the settlement. The motion shall be noticed for hearing for the date set forth in paragraph 11 above. Defendants may file and serve a memorandum in support of final approval of the Settlement Agreement or in response to objections no later than **October 12, 2017.**

/ / /

/ / /

14. All proceedings in the Action, other than proceedings necessary to carry out or enforce the Settlement Agreement or this Order, are stayed pending the final fairness hearing and the court's decision whether to grant final approval of the settlement.

Dated this 12th day of June, 2017.

/s/
_____
Fernando M. Olguin
United States District Judge