**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JASON LEWIS, et al., on behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br><br>      v.<br><br>GREEN DOT CORPORATION, et al.,<br><br>             Defendants. | Case No. CV 16-3557 FMO (AGRx)<br><br><br>**ORDER RE: FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF ATTORNEY'S FEES, COSTS & SERVICE AWARDS** |

Having reviewed and considered Plaintiffs' Motion for Final Approval of the Class Action Settlement, (Dkt. 105, "Motion"), and Plaintiffs' Motion for Award of Attorneys' Fees, Expenses, and Service Awards for Plaintiffs, (Dkt. 104, "Fees Motion"), and the oral argument presented during the final fairness hearing held on November 2, 2017, the court concludes as follows.

## INTRODUCTION

On May 22, 2016, Jason Lewis ("Lewis"), Danielle Hall ("Hall") and JC Montgomery ("Montgomery") filed a class action complaint against Green Dot Corporation ("Green Dot Corp"), Green Dot Bank ("Green Dot Bank" and together with Green Dot Corp, "Green Dot defendants"), MasterCard Incorporated ("MasterCard Corp"), and MasterCard International Incorporated ("MasterCard" and together with MasterCard Corp, the "MasterCard defendants") (collectively "defendants"), asserting claims arising from a service disruption from May 14, 2016, through May

22, 2016 ("Service Disruption"), as a result of Green Dot's conversion to a new processing company. (See Dkt. 1, Lewis Complaint at ¶ 19-25) ("Lewis Action").

On June 10, 2016, Kathleen Crook ("Crook"), filed a similar class action against the same defendants. The Crook case was transferred to this court and, on July 14, 2016, the court consolidated the two cases. (See Dkt. 63, Order re: Consolidation). On September 9, 2016, Lewis, Hall, and Justin Thornton ("Thornton") (collectively, "plaintiffs") filed a consolidated complaint ("CC") asserting claims for: (1) negligence; (2) unjust enrichment; (3) breach of contract; (4) conversion; (5) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq.; (6) violation of California's Unfair Business Practices Act ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; and (7) breach of bailment contract. (See Dkt. 70, CC at ¶¶ 65-124). While the negligence claim is asserted against all defendants, the remaining claims are asserted only against the Green Dot defendants. (See id.).

The parties reached a settlement in October 2016. (Dkt. 102, Court's Order of June 12, 2017 ("Preliminary Approval Order" or "PAO") at 2). However, at the January 12, 2017, hearing on plaintiffs' initial motion for preliminary approval, the court expressed concerns regarding the settlement. (Id.). Thereafter, plaintiffs filed the operative First Amended Complaint ("FAC"), asserting the same claims for relief against the same defendants, (see id.; Dkt. 89, FAC), and on February 13, 2017, following renewed negotiations and a revised settlement, (see Dkt. 102, PAO at 2), plaintiffs filed a renewed motion for preliminary approval. (See id.).

On April 21, 2017, plaintiffs filed revised notice documents to address the court's concerns expressed at the April 13, 2017, hearing. (See Dkt. 102, PAO at 2). On June 12, 2017, the court granted preliminary approval of the settlement, appointed Epiq Systems ("Epiq") as settlement administrator, and directed Epiq to provide notice to the class members. (See id. at 28-29).

Plaintiffs now seek: (1) final approval of the settlement; (2) attorney's fees and costs; and (3) service awards for plaintiffs. (See Dkt. 105, Motion at 18; Dkt. 104, Fees Motion at 1-2).

## BACKGROUND

I.   PLAINTIFFS' CLAIMS.

This case arises from a service disruption that affected Green Dot Prepaid Cards. Plaintiffs

allege that each class member had a Green Dot Prepaid Card, which is a prepaid debit card issued and serviced through Green Dot. (See Dkt. 89, FAC at ¶¶ 1, 32, 40, 46). As a prepaid debit card, account holders must add or "load" funds to their account to use the card. (Id. at ¶ 18). The card can be used in the same manner and locations as other debit cards. (Id. at ¶ 19). The Green Dot Prepaid Cards also allow account holders to elect to have their employment wages directly deposited to the card. (Id. at ¶ 20). An advertised feature of the Green Dot Prepaid Cards is that such funds will be available to the account holder the day the transfer from the employer is made, "which may be up to two days earlier than the availability of direct transfers of payroll funds to a traditional banking account." (Id.). Green Dot charges account holders fees, such as monthly fees, ATM withdrawal fees, transaction fees, and balance inquiry fees. (Id. at ¶ 21).

Green Dot entered into an agreement with MasterCard whereby MasterCard would become the new processing services provider for Green Dot. (See Dkt. 89, FAC at ¶ 22). The migration process was to be implemented in four waves. (Id.). "Wave Three" was to occur over a 12-hour period beginning on May 14, 2016, at 7:00 p.m. EDT. (Id. at ¶ 23). Prior to the implementation of Wave Three, Green Dot Prepaid Card customers whose accounts would be included in Wave Three received notice that they would be unable to access their accounts during the 12-hour migration process.[1] (Id. at ¶ 24).

However, the loss of access to Green Dot accounts "lasted significantly longer than the expected 12-hour period for some Green Dot Prepaid Card customers." (Dkt. 89, FAC at ¶ 26). Approximately 58,600 customers whose accounts were included in Wave Three "experienced a longer than anticipated disruption in service for portions of the period of time between May 15, 2016 and May 22, 2016."[2] (Id.).

On May 18, 2016, defendants announced that access had been restored and that the only

---

[1] Of the accounts included in Wave Three, 93% were WalMart MoneyCard-branded cards and seven percent were Green Dot-branded cards, both issued by Green Dot. (See Dkt. 102, PAO at 3 n. 1; Dkt. 89, FAC at ¶ 25).

[2] Plaintiffs allege that this was not the first such incident involving the MasterCard defendants. (Dkt. 89, FAC at ¶ 31). For example, in October 2015, they experienced a similar extended service disruption related to another prepaid debit card called RushCard. (Id.).

service affected during the Service Disruption was balance inquiries. (See Dkt. 89, FAC at ¶ 27). However, card holders reported a larger impact on social media. (Id.; see also id. at ¶ 28) (reproduction of complaints posted on Facebook). During the Service Disruption, card holders "lacked access to their funds, causing hardship, including the inability to pay for basic necessities like food, rent, electricity and gas. Additionally, customers were unable to pay their household bills, resulting in late fees being assessed." (Id. at ¶ 28).

On May 22, 2016, Green Dot posted an announcement on its Facebook page stating that all issues had been resolved. (See Dkt. 89, FAC at ¶ 29). However, many cardholders, including plaintiffs, still had not regained access. (Id.). For instance, Lewis alleges that he did not have access to his account for at least a week.[3] (Id. at ¶ 38). As a result, he was late on his rent, was charged an $82 late fee, and was threatened with eviction. (Id. at ¶ 39). Lewis was also late on his car payment, and assessed a late fee of $18. (Id.). In order to pay other expenses, Lewis had to "pawn[] his television and watch[,]" and borrow money from friends. (Id.). Hall's inability to access her funds for a week resulted in a late car insurance payment, for which she was assessed a $20 late fee. (See id. at ¶¶ 43-45). Finally, Thornton was unable to access his funds until the end of May, 2016, (id. at ¶ 54), and was unable to pay his auto insurance, resulting in termination. (Id. at ¶ 52). Thornton was also forced to borrow $300 from his employer to purchase food.[4] (Id. at ¶ 53).

II.    SETTLEMENT AGREEMENT.

The parties defined the settlement class as:

> All cardholders, as identified in Green Dot Defendants' business records, who
>
> attempted to and were unable to use their Green Dot-issued, MasterCard-

_____

[3] Plaintiffs allege that a few days prior to the planned outage, Lewis called Green Dot to question suspicious charges, which turned out to be legitimate, but a miscommunication during the call resulted in Lewis's account being cancelled. "A new card was to be issued[]" before the conversion; however, the conversion did not pick up his and other "ghost accounts." (See Dkt. 89, FAC at ¶¶ 33, 37).

[4] "[I]nformation exchanged between counsel . . . confirmed that JC Montgomery and Kathleen Crook were not affected by the Service Disruption as they believed and they elected not to proceed as class representatives." (Dkt. 102, PAO at 5 n. 4).

4

1    processed cards to access or spend their account funds from May 15, 2016

2    through May 22, 2016 as a result of the Service Disruption.

3    (Dkt. 90-1, Stipulation of Amended Agreement and Settlement and Release ("Settlement

4    Agreement") at § III.2.; Dkt. 102, PAO at 5).  Excluded from the class are the court, the officers

5    and directors of defendants, persons who have been separately represented by an attorney and

6    entered into a separate settlement agreement, and persons who exclude themselves.  (Dkt. 90-1,

7    Settlement Agreement at § III.3.).

8    Defendants have already provided two benefits to compensate some class members for

9    the inconvenience and losses caused by the Service Disruption.  First, most class members with

10   an active Green Dot account received a two-month fee holiday ("Fee Holiday") during which they

11   were not assessed any monthly maintenance fees.  (See Dkt. 90-1, Settlement Agreement at §

12   IV.1.(a).).  At the time of the Third Wave, the monthly maintenance fee for the affected cards "fell

13   within a range of $3.00-$7.95 depending on the card[.]"  (Id.).  Second, class members who had

14   an active Green Dot account in May and June 2016, "received credits to their accounts in the

15   amount of $50.00 each [("Courtesy Credit")]."  (Id. at § IV.1.(b).).  Green Dot issued approximately

16   58,275 Courtesy Credits, for a total of $2,913,750.  (Id.).  Through the Fee Holiday and Courtesy

17   Credit, Green Dot has provided more than $3.3 million to class members.[5]  (Id. at § IV.1.(c).).

18   Defendants will also provide prospective relief to class members as follows:

19   • Tier 1 Claims – Fee Holiday Extension:  Each settlement class member will be entitled

20     to a one-month extension of the Fee Holiday.  (Dkt. 90-1, Settlement Agreement at §

21     IV.2.(a).).  This benefit may be provided, at Green Dot's election, via account credits,

22     checks, or funds.  (Id.).  This benefit is automatic and will not require class members to file

23     claims.  (Id.).

24   • Tier 2 Claims – Payment for Losses Without Documentation:  Class members "who

25     attempted to and were unable to use their Prepaid Cards to access or spend their account

---

26

27     [5]  Approximately $1.1 million has also been provided in "individualized courtesy credits," a
     portion of which went to individuals who were represented by counsel, and thus fall outside the
28     class definition.  (See Dkt. 90-1, Settlement Agreement at § IV.1.(c).).

funds from May 15, 2016 through May 22, 2016 and who claim to have suffered a financial or other loss as a result of the Service Disruption but do not have or do not wish to provide Reasonable Documentation will be eligible for a payment up to $100.00."[6] (Dkt. 90-1, Settlement Agreement at § IV.3.(a).). However, any prior payments received by a class member from Green Dot "as restitution for the Service Disruption, other than the Fee Holiday, will be offset against the $100.00 (or lesser) payment." (Id. at § IV.3.(b).).

• Tier 3 Claims – Payment for Substantiated Losses:  Class members "who attempted to and were unable to use their Prepaid Cards to access or spend their account funds from May 15, 2016 through May 22, 2016 as a result of the Service Disruption and who provide Reasonable Documentation of Substantiated Losses will be eligible for a payment of the lesser of the amount of such loss or $750.00." (Dkt. 90-1, Settlement Agreement at § IV.4.(a).). However, any prior payments received by the class member from Green Dot "as restitution for the Service Disruption, other than the Fee Holiday, will be offset against the $750.00 (or lesser) payment." (Id. at § IV.4.(b).).

The Tier 2 claims are subject to an aggregate amount not to exceed $2 million ("Tier 2 Maximum").  (Dkt. 90-1, Settlement Agreement § IV.3.(c).).  If Tier 2 claims exceed the Tier 2 Maximum, each claim will be reduced on a pro rata basis.  (Id.).  If such claims do not reach the Tier 2 Maximum, the "difference between the claimed amount and the Tier 2 Maximum shall be made available to expand the Tier 3 Maximum[.]"  (Id.).  The Tier 3 claims are subject to an aggregate amount not to exceed $1.5 million, "plus the rollover from Tier 2, if any," ("Tier 3 Maximum"), and if valid claims exceed the Tier 3 Maximum, each claim will be reduced on a pro rata basis.  (Id. at § IV.4(c).).

---

[6] "Reasonable Documentation" is defined as "documentation tending to establish Substantiated Losses fairly traceable to the Service Disruption[, including for instance] receipts, account statements, letters or records from employers confirming payments or losses, and letters from landlords confirming payments or losses."  (Dkt. 90-1, Settlement Agreement at § II.19.). "Substantiated Losses" is defined as "financial or other losses reasonably traceable to the Service Disruption for which the [class member] submits Reasonable Documentation.  Non-exhaustive examples of Substantiated Losses include late fees, declined payment fees, utility disruption or restoration fees, loss of housing, and lost wages."  (Id. at § II.27.).

"Combined across Tiers 2 and 3, Defendants agree to pay a guaranteed minimum of $1,500,00.00 ("Minimum Payment").  If an insufficient number of valid and timely claims are submitted and paid to exhaust the Minimum Payment Amount . . . then the remaining funds shall be distributed to the following cy pres recipient, subject to Court approval: Consumer Action, a non-profit corporation that provides financial advocacy and education to consumers nationwide." (Dkt. 90-1, Settlement Agreement at § IV.5.).

"Under Tier 2 and Tier 3, Defendants shall have no obligation to make payments above the Minimum Payment unless the total value of validly filed claims exceeds the Minimum Payment. In such case, Defendants shall pay the amount of the validly-filed claims and no more.  In no event shall Defendants' payment obligations under Tier 2 exceed the Tier 2 Maximum, and in no event shall Defendants' payment obligations under Tier 3 exceed the Tier 3 Maximum."  (Dkt. 90-1, Settlement Agreement at § IV.5.).

Class members may seek payment under Tier 2 or Tier 3 by filing a valid and timely claim form, which will be available on the settlement website as well as from the claims administrator. (Dkt. 90-1, Settlement Agreement at § IV.7.(b).-(c).).  The claims will be "subject to a two-part claims and verification process."  (Id. at § IV.7.(d).-(e).).  With respect to both Tier 2 and Tier 3, class members will be required to "submit a brief explanation, under penalty of perjury, as to how the Service Disruption caused them a loss and as to the amount of loss claimed as a result of the Service Disruption."  (Id. at § IV.7.(d).).  Green Dot will then "confirm according to its business records that the [class member] held a Green Dot-issued, MasterCard-processed card and attempted to and was unable to use or activate such card as a direct result of the Service Disruption."  (Id.).  Tier 3 claims will additionally require submission of "Reasonable Documentation" to support the claims.  (Id. at § IV.7.(e).).  If such claims are submitted without Reasonable Documentation, the Settlement Administrator will send a notice to the claimant explaining the deficiency and providing 30 days to submit adequate documentation to support the claim.  (See id. at § IV.7.(g).).  If Reasonable Documentation is not provided, the Tier 3 claim will be processed as a Tier 2 claim.  (Id.).

"All costs associated with or incurred by the Settlement Administrator shall be borne by and

separately paid by Defendants[,]" including "costs and expenses associated with providing notice" to the class.  (See Dkt. 90-1, Settlement Agreement at §§ VI.3., VII.8.).  According to plaintiffs, the estimated cost of claims administration is approximately $145,350.  (See Dkt. 105, Motion at 6).  Finally, defendants will not oppose an application for an award of attorney's fees and costs in the amount of $750,000, (see Dkt. 90-1, Settlement Agreement at § X.2.), or oppose service awards of $500 for each class representative.  (See id. at § X.1.).

III.    NOTICE TO THE CLASS.

Epiq, the court-appointed settlement administrator, has implemented the notice program previously approved by the court.  (See Dkt. 105, Motion at 7-11; Dkt. 105-1, Supplemental Declaration of Ricky Borges Regarding Notice ("Borges Decl.") at ¶¶ 6-16; Dkt. 102, PAO at 25-27 (approving notice program)).  On July 13, 2017, after updating addresses via a National Change of Address ("NCOA") search, Epiq sent Notice to 57,808 class members via U.S. Mail.  (See Dkt. 105-1, Borges Decl. at ¶¶ 6-8 & Exhibit ("Exh.") B (Notice)).  Of the 57,808 Notices, 1,499 were undeliverable as addressed, and as of October 12, 2017, Epiq re-mailed 604 Notices after using a third-party lookup service.  (See Dkt. 105-1, Borges Decl. at ¶ 9).

Epiq also established a toll-free telephone number, which received a total of 2,418 calls.  (See Dkt. 105-1, Borges Decl. at ¶ 15).   Finally, Epiq maintained a settlement website, www.GreenDotServiceDisruption.com, which as of October 12, 2017, received 55,980 visitor sessions with 349,774 page views.  (Id. at ¶ 16).

As of October 12, 2017, Epiq has received 16,364 Claim Forms, of which 1,805 appear "facially complete," 191 require further assessment since the submitted Claim Forms are incomplete, and 14,368 "could not be matched to the Settlement Class List ('unmatched claims')." (Dkt. 105-1, Borges Decl. at ¶ 10).  Of the 16,364 Claim Forms received, 16,145 were received online via the Settlement Website, and 219 were received via U.S. Mail.  (Id.).  Epiq will continue to work on identifying or resolving the unmatched claims.[7]

---

[7]  Class members must submit Claim Forms no later than 30 days following the time period for seeking appellate review of the court's final approval or the settlement is affirmed on appeal.  (See Dkt. 90-1, Settlement Agreement at §§ II.4., II.10.).

1       As of October 12, 2017, Epiq has received two requests for exclusion (only one of which

2  was from a known Settlement Class Member), and no objections.  (See Dkt. 105-1, Borges Decl.

3  at ¶ 14; Dkt. 105, Motion at 15; see, generally, Dkt.).

4                            **LEGAL STANDARD**

5       Federal Rule of Civil Procedure 23 provides that "the claims, issues, or defenses of a

6  certified class may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "The

7  primary concern of [Rule[8] 23(e)] is the protection of th[e] class members, including the named

8  plaintiffs, whose rights may not have been given due regard by the negotiating parties."  Officers

9  for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F., 688 F.2d 615, 624 (9th Cir. 1982), cert.

10  denied, 459 U.S. 1217 (1983).  Whether to approve a class action settlement is "committed to the

11  sound discretion of the trial judge[,]" Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th

12  Cir.), cert. denied, 506 U.S. 953 (1992), who must examine the settlement for "overall fairness."

13  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).  The court may not "delete, modify

14  or substitute certain provisions.  The settlement must stand or fall in its entirety."  Id. (internal

15  quotation marks and citation omitted).

16       In order to approve a settlement in a class action, the court must conduct a three-step

17  inquiry.  First, it must assess whether defendants have met the notice requirements under the

18  Class Action Fairness Act ("CAFA").  See 28 U.S.C. § 1715(d).  Second, it must determine

19  whether the notice requirements of Rule 23(c)(2)(B) have been satisfied.  Finally, it must conduct

20  a hearing to determine whether the settlement agreement is "fair, reasonable, and adequate."  See

21  Fed. R. Civ. P. 23(e)(2); Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003) (discussing the

22  Rule 23(e)(2) standard); Adoma v. Univ. of Phoenix, Inc., 913 F.Supp.2d 964, 972 (E.D. Cal.

23  2012) (conducting three-step inquiry).

24       In determining whether a settlement agreement is fair, adequate, and reasonable, the court

25  must weigh some or all of the following factors:  "(1) the strength of the plaintiff's case; (2) the risk,

26  expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action

27  

28     [8]  All "Rule" references are to the Federal Rules of Civil Procedure.

1  status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

2  completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the

3  presence of a governmental participant; and (8) the reaction of the class members of the proposed

4  settlement." In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011) (quoting

5  Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004)).

6         However, when "a settlement agreement is negotiated prior to formal class certification,

7  consideration of these eight . . . factors alone is not enough to survive appellate review."

8  Bluetooth, 654 F.3d at 946 (emphasis in original).  This is because, "[p]rior to formal class

9  certification, there is an even greater potential for a breach of fiduciary duty owed the class during

10  settlement."  Id.  District courts, therefore, also must determine "that the settlement is not the

11  product of collusion among the negotiating parties."  Id. at 947 (internal quotation and alteration

12  marks omitted).  In making that determination, courts should look for signs of collusion, including

13  "(1) when counsel receive a disproportionate distribution of the settlement, or when the class

14  receives no monetary distribution but class counsel are amply rewarded[;]" "(2) when the parties

15  negotiate a `clear sailing' arrangement providing for the payment of attorneys' fees separate and

16  apart from class funds[;]" and "(3) when the parties arrange for fees not awarded to revert to

17  defendants rather than be added to the class fund[.]"  Id. (internal quotation marks and citations

18  omitted).

19                                    **DISCUSSION**

20  I.     FINAL APPROVAL OF CLASS SETTLEMENT.

21         A.     Class Action Fairness Act.

22         CAFA requires that "[n]ot later than 10 days after a proposed settlement of a class action

23  is filed in court, each defendant that is participating in the proposed settlement shall serve [notice

24  of the proposed settlement] upon the appropriate State official of each State in which a class

25  member resides and the appropriate Federal official[.]" 28 U.S.C. § 1715(b).  The statute provides

26  detailed requirements for the contents of such a notice, which must include, among other things,

27  "any proposed or final notification to class members[,]" and "any proposed or final class action

28  settlement[.]"  28 U.S.C. §§ 1715(b)(3) & (4).  The court may not grant final approval of a class

action settlement until the CAFA notice requirement is met.  See id. at § 1715(d) ("An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under [28 U.S.C. § 1715(b)]").

Here, Epiq provided CAFA notice on December 15, 2016, and a supplemental CAFA notice on February 17, 2017.  (See Dkt. 105-1, Borges Decl. at ¶¶ 4-5 & Exhs. A, B).  Counsel for defendants confirmed at the final fairness hearing that there have been no objections to the settlement from the state and federal officials that received the CAFA notices.

B.     Class Certification.

In its order granting preliminary approval, the court certified the class pursuant to Rule 23(b)(3).  (See Dkt. 102, PAO at 12-18, 28).  Because circumstances have not changed, the court hereby affirms its order certifying the class for settlement purposes under Rule 23(e).  See In re Apollo Grp. Inc. Sec. Litig., 2012 WL 1378677, *4 (D. Ariz. 2012) ("The Court has previously certified, pursuant to Rule 23 of the Federal Rules of Civil Procedure, and hereby reconfirms its order certifying a class.").

C.     Rule 23(c) Notice Requirements.

Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2) and, upon settlement of a class action, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2) requires the "best notice that is practicable under the circumstances, including individual notice" of particular information.  See Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

After undertaking the required examination, the court approved the form of the proposed class notice.  (See Dkt. 102, PAO at 25-28).  As discussed above, the notice program has been implemented by Epiq.  See supra Background at § III.  Accordingly, based on its prior findings and the record before it, the court finds that the class notice and the notice process fairly and adequately informed the class members of the nature of the action, the terms of the proposed settlement, the effect of the action and release of claims, the class members' right to exclude

themselves from the action, and their right to object to the proposed settlement. (See Dkt. 102, PAO at 25-28; see also Dkt. 105-1, Borges Decl. at ¶ 6-16 & Exhs. B, C (Notice & Claim Package)).

      D.    <u>Whether the Class Settlement is Fair, Adequate and Reasonable</u>.

      1.    **The Strength of Plaintiffs' Case, and the Risk, Expense, Complexity, and Duration of Further Litigation**.

In evaluating the strength of the case, the court should assess "objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach [a settlement]." <u>Adoma</u>, 913 F.Supp.2d at 975. "In assessing the risk, expense, complexity, and likely duration of further litigation, the court evaluates the time and cost required." <u>Id.</u> at 976.

Here, plaintiffs recognize the significant risk that defendants could move to compel arbitration if the case were to proceed. (<u>See</u> Dkt. 105, Motion at 12; <u>see also</u> Dkt. 102, PAO at 22 (noting litigation risks)). According to plaintiffs' counsel, they "discovered that affected consumers who make up the Settlement Class have agreed to arbitration in the event they pursued claims against Defendants." (Dkt. 102, PAO at 22) (quoting declaration of plaintiffs' counsel). Additionally, defendants maintained that class certification is inappropriate because of individualized factual inquiries and legal variation among the law of the states. (<u>See</u> Dkt. 105, Motion at 12). Finally, further litigation would entail expert discovery, potential interlocutory appeal under Rule 23(f), summary judgment proceedings, trial, and post-trial appeals. (<u>See</u> <u>id.</u>). Settlement affords class members benefits, and for those class members with more significant losses, a claims process has been established. Given that any decision on the merits would likely be appealed, (<u>see</u> <u>id.</u> at 12), the court finds it significant that the class members will receive "immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." <u>Nat'l Rural Telecommc'ns. Coop. v. DIRECTV, Inc.</u>, 221 F.R.D. 523, 526 (C.D. Cal. 2004). In short, the court finds that this factor supports a finding that the settlement is fair, adequate, and reasonable.

2. **The Risk of Maintaining Class Action Status Through Trial**.

Because the parties reached settlement prior to the filing of a motion for class certification, plaintiffs faced a risk that the class would not be certified. Accordingly, this factor weighs in favor of approving the settlement. See Chambers v. Whirlpool Corp., 2016 WL 5922456, *6 (C.D. Cal. 2016) ("Because plaintiffs had not yet filed a motion for class certification, there was a risk that the class would not be certified.").

3. **The Amount Offered in Settlement**.

"[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotation marks omitted). In granting preliminary approval of the settlement, the court concluded that the settlement benefits were fair, adequate, reasonable and compelling in light of the litigation risks in the case. (See Dkt. 102, PAO at 20-22). Accordingly, this factor also weighs in favor of final approval.

4. **The Extent of Discovery Completed and the Stage of Proceedings**.

"A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." Nat'l Rural Telecommc'ns. Coop., 221 F.R.D. at 528. "A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." Id. at 527. The court previously examined this factor at length, noting that while the parties did not engage in formal discovery, defendants provided "information and data" on a voluntary basis, (Dkt. 102, PAO at 19), and some counsel were involved in litigation surrounding a similar service disruption where they obtained information that could be used to set the amount of settlement benefits in this matter. (See id.; see also Dkt. 104-1, Declaration of John Yanchunis in Support of Plaintiffs' Unopposed Motion for Attorneys' Fees, Expenses and Service Awards ("Yanchunis Decl.") at ¶ 6). Thus, the court is persuaded that the parties entered the settlement discussions with a substantial understanding of the factual and legal issues from which they could advocate for their respective positions. See Linney, 151 F.3d at 1239 ("[F]ormal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make

an informed decision about settlement."); <u>Clesceri v. Beach City Investigations & Protective Services, Inc.</u>, 2011 WL 320998, *9 (C.D. Cal. 2011) (same); <u>Nat'l Rural Telecommc'ns</u>, 221 F.R.D. at 527-28 (noting that parties' examination of the factual and legal bases of the disputed claims through completion of discovery "strongly militates in favor of the Court's approval of the settlement"); <u>Barbosa v. Cargill Meat Solutions Corp.</u>, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("What is required is that sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently.") (internal quotation marks omitted).  In short, this factor also supports approval of the settlement.

### 5. **The Experience and Views of Counsel**.

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.  This is because parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation."  <u>Nat'l Rural Telecommc'ns</u>, 221 F.R.D. at 528 (internal quotation marks and citation omitted).  The court has previously noted that class counsel are adequate.  (<u>See</u> Dkt. 102, PAO, at 15-16).  Moreover, according to plaintiffs, the settlement provides "substantial benefits for the thousands of Settlement Class members" and is "fair, reasonable and adequate[.]"  (Dkt. 105, Motion at 1).  Thus, this factor also supports approval of the settlement.

### 6. **The Presence of a Governmental Participant**.

There is no government participant in this matter.  Accordingly, this factor is inapplicable.  <u>See</u> <u>Wren v. RGIS Inventory Specialists</u>, 2011 WL 1230826, *10, <u>supplemented by</u> 2011 WL 1838562 (N.D. Cal. 2011) (noting that lack of government entity involved in case rendered this factor inapplicable to the analysis).

### 7. **The Reaction of Class Members to the Proposed Settlement**.

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."  <u>Nat'l Rural Telecommc'ns</u>, 221 F.R.D. at 529.  Here, the reaction of the class has been positive.  While approximately 56,913 class members received

direct mail notice, (see Dkt. 105-1, Borges Decl. at ¶¶ 8-9), only 2 individuals timely requested exclusion (only one of which was a known settlement class member), (see id. at ¶ 14), and significantly, there were no objections to the settlement.[9]  (See Dkt. 105, Motion at 15, see, generally, Dkt.).  The lack of objections and the small number of exclusions support approval of the settlement.  See, e.g., Franco v. Ruiz Food Prods., Inc., 2012 WL 5941801, *14 (E.D. Cal. 2012) (finding this factor weighed in favor of approval when only two out of 2,055 class members – less than one percent – opted out, and there were no objections to the settlement); Gong-Chun v. Aetna Inc., 2012 WL 2872788, *16 (E.D. Cal. 2012) (settlement approved when less than two percent of the class members opted out and no objections were received); Barcia v. Contain-A-Way, Inc., 2009 WL 587844, *4 (S.D. Cal. 2009) (finding this factor weighed in favor of approval of settlement when out of the 2,385 class members, there were no objections and only 56 class members opted out).

     E.    Cy Pres Designee.

The settlement provides that if an insufficient number of valid and timely claims are submitted and paid to exhaust the minimum guaranteed amount, then defendants will pay the difference of the Minimum Payment ($1.5 million minus the total value of valid claims filed across Tier 2 and Tier 3), to Consumer Action, as a cy pres recipient.  (See Dkt. 90-1, Settlement Agreement at § IV.5.).

Courts may approve cy pres distributions if there is "a driving nexus between the plaintiff class and the cy pres beneficiaries."  Dennis v. Kellogg Co., 697 F.3d 858, 865 (9th Cir. 2012).  A cy pres award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members, and must not benefit a group too remote from the plaintiff class[.]"  Id. (internal quotation marks and citations omitted).

Here, Consumer Action is a non-profit organization "with a stated mission to empower low- and moderate-income, limited-English-speaking, and other underrepresented consumers nationwide to financially prosper through education and advocacy."  (See Dkt. 90, Amended

---

[9] Class counsel confirmed at the final fairness hearing that no objections have been received.

1  Motion for Preliminary Approval [] at 29) (internal quotation marks and alterations omitted).

2  Moreover, Consumer Action "has worked to educate unbanked and underbanked consumers

3  about how to establish and use traditional banking services and make wiser banking and financial

4  decisions."  (Id.).  "Use of prepaid payment card is most prevalent am[ong] underbanked

5  household (an estimated 27.1%)."  (Id. at 30).  In short, the court is persuaded that there is a

6  driving nexus between plaintiff class and Consumer Action.

7  II.    ATTORNEY'S FEES, COSTS AND SERVICE AWARDS.

8       The Settlement Agreement provides that defendants will not oppose class counsel's

9  request for attorney's fees and reimbursement of costs and expenses of up to $750,000.  (See

10  Dkt. 90-1, Settlement Agreement at § X.2.).  Class counsel now seek such an award.  (See Dkt.

11  104, Fees Motion at 1, 23).

12       A.    Attorney's Fee Award.

13       Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable

14  attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."

15  Fed. R. Civ. P. 23(h).  In diversity actions such as this one, the Ninth Circuit applies state law to

16  determine the right to fees and the method for calculating fees.  See Mangold v. Cal. Public Util.

17  Comm'n, 67 F.3d 1470, 1478 (9th Cir. 1995) ("Existing Ninth Circuit precedent has applied state

18  law in determining not only the right to fees, but also in the method of calculating the fees.");

19  Rodriguez v. Disner, 688 F.3d 645, 653 n. 6 (9th Cir. 2012) ("If . . . we were exercising our

20  diversity jurisdiction, state law would control whether an attorney is entitled to fees and the method

21  of calculating such fees.").

22       The California Supreme Court recently held that courts have discretion to choose among

23  two different methods for calculating a reasonable attorney's fees award.  See Laffitte v. Robert

24  Half Int'l Inc., 1 Cal.5th 480, 504 (2016) ("The choice of a fee calculation method is generally one

25  within the discretion of the trial court, the goal under either the percentage or lodestar approach

26  being the award of a reasonable fee to compensate counsel for their efforts."); see also Bluetooth,

27  654 F.3d at 942 ("courts have discretion to employ either the lodestar method or the percentage-

28  of-recovery method").  "The lodestar method, or more accurately the lodestar-multiplier method,

1   calculates the fee by multiplying the number of hours reasonably expended by counsel by a

2   reasonable hourly rate.  Once the court has fixed the lodestar, it may increase or decrease that

3   amount by applying a positive or negative multiplier to take into account a variety of other factors,

4   including the quality of the representation, the novelty and complexity of the issues, the results

5   obtained, and the contingent risk presented."  Laffitte, 1 Cal.5th at 489 (internal quotation marks

6   omitted).  "The percentage method calculates the fee as a percentage share of a recovered

7   common fund or the monetary value of plaintiffs' recovery."  Id.  "Though courts have discretion

8   to choose which calculation method they use, their discretion must be exercised so as to achieve

9   a reasonable result."  Bluetooth, 654 F.3d at 942; see Laffitte, 1 Cal.5th at 489; Glass v. UBS Fin.

10  Servs., Inc., 2007 WL 221862, *14 (N.D. Cal. 2007), aff'd, 331 F.App'x 452 (9th Cir. 2009) ("As

11  always, when determining attorneys' fees, the district court [is] guided by the fundamental principle

12  that fee awards out of common funds be reasonable under the circumstances.") (internal quotation

13  marks and emphasis omitted).

14         Under the circumstances here, the court is persuaded that the lodestar method is the most

15  appropriate so as to achieve a reasonable result.  Having reviewed class counsel's submission

16  in connection with their Fees Motion, the court finds that their lodestar in the amount of $684,703

17  is reasonable given the work performed in this litigation and the prevailing rates in the community

18  for lawyers of comparable skill, experience, and reputation.  (See Dkt. 104, Fees Motion at 7, 9-13;

19  Dkt. 104-1, Yanchunis Decl. at ¶¶ 15-24; Dkt. 104-2, Declaration of Jean Sutton Martin ("Martin

20  Decl.") at ¶¶ 8, 10-11; Dkt. 104-3, Declaration of Joseph G. Sauder in Support of Plaintiffs'

21  Unoppo[]sed Motion for Attorneys' Fees, Expenses and Incentive Awards ("Sauder Decl.") at ¶¶

22  5-11; Dkt. 104-4, Declaration of Daniel C. Girard in Support of Plaintiffs' Unopposed Motion for

23  Attorneys' Fees, Expenses and Incentive Awards ("Girard Decl.") at ¶¶ 5-10).[10]

24         As noted above, "[o]nce the court has fixed the lodestar, it may increase or decrease that

25

26         [10] "California case law permits fee awards in the absence of detailed time sheets."  Wershba

27  v. Apple Computer, Inc., 91 Cal.App.4th 224, 255 (2001) (citations omitted) ("An experienced trial

28  judge is in a position to assess the value of the professional services rendered in his or her

    court.").

1   amount by applying a positive or negative multiplier to take into account a variety of other factors,

2   including the quality of the representation, the novelty and complexity of the issues, the results

3   obtained, and the contingent risk presented." Laffitte, 1 Cal.5th at 489 (internal quotation marks

4   omitted).  The contingency risk multiplier is one of the most commonly used to adjust the lodestar.

5   It is based on the notion that a "contingent fee compensates the lawyer not only for the legal

6   services he renders but for the loan of those services.  The implicit interest rate on such a loan is

7   higher because the risk of default (the loss of the case, which cancels the debt of the client to the

8   lawyer) is much higher than that of conventional loans.  A lawyer who both bears the risk of not

9   being paid and provides legal services is not receiving the fair market value of his work if he is paid

10  only for the second of these functions.  If he is paid no more, competent counsel will be reluctant

11  to accept fee award cases." Graham v. DaimlerChrysler Corp., 34 Cal.4th 553, 579-80 (2004)

12  (internal quotation marks and citations omitted).

13         Here, class counsel prosecuted this action on a contingent-fee basis, incurred 100% of the

14  risk, with the "understanding that they would receive a fee only if the case was successful."  (See

15  Dkt. 104, Fees Motion at 17-18; Dkt. 104-1, Yanchunis Decl. at ¶¶ 14, 28; Dkt. 104-2, Martin Decl.

16  at ¶ 7; Dkt. 104-3, Sauder Decl. at ¶¶ 6, 12; Dkt. 104-4, Girard Decl. at ¶¶ 7, 11).  Under the

17  circumstances, counsel's request for a 1.095 multiplier is reasonable, (see Dkt. 104, Fees Motion

18  at 14), especially given that "settlement administration is ongoing" and it is expected that the

19  lodestar figure will "meaningfully increase by the time the settlement is completely and finally

20  administered." (Dkt. 104-1, Yanchunis Decl. at ¶ 24; Dkt. 104-3, Sauder Decl. at ¶ 11; Dkt. 104-4,

21  Girard Decl. at ¶ 10; see also Dkt. 104-2, Martin Decl. at ¶ 11).  Moreover, the 1.095 multiplier is

22  reasonable in light of the results achieved in this litigation, and is well within the range of

23  multipliers applied by both state and federal courts.  See, e.g., Wershba, 91 Cal.App.4th at 255

24  ("Multipliers can range from 2 to 4 or even higher."); Vizcaino v. Microsoft Corp., 290 F.3d 1043,

25  1052 (9th Cir.), cert. denied, 537 U.S. 1018 (2002) (surveying multipliers in 23 class action suits

26  and recognizing that courts applied multipliers of 1.0 to 4.0 in 83% of surveyed cases); Parkinson

27  v. Hyundai Motor Am., 796 F.Supp.2d 1160, 1170 (C.D. Cal. 2010) (observing that "multipliers

28  may range from 1.2 to 4 or even higher"); Hopkins  v. Stryker Sales Corp., 2013 WL 496358, *4

1  (N.D. Cal. 2013) ("Multipliers of 1 to 4 are commonly found to be appropriate in complex class

2  action cases."). In short, the requested attorney's fee award is fair and reasonable.[11]

3      B.      Costs.

4      Class counsel seek $21,403 in costs.[12] (See Dkt. 104, Fees Motion at 20; Dkt. 104-1,

5  Yanchunis Decl. at ¶ 26; see also Dkt. 104-2, Martin Decl. at ¶ 9; Dkt. 104-3, Sauder Decl. at ¶

6  13; Dkt. 104-4, Girard Decl. at ¶ 12). The court finds that the costs incurred by class counsel over

7  the course of this litigation are reasonable, and therefore awards a total of $21,403 in costs.

8      C.      Class Representatives Service Award.

9      "[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs,

10 are eligible for reasonable incentive payments." Staton, 327 F.3d at 977; see Wren, 2011 WL

11 1230826, at *31 ("It is well-established in this circuit that named plaintiffs in a class action are

12 eligible for reasonable incentive payments, also known as service awards."). Here, plaintiffs

13 request that the court grant a service award in the amount of $500.00 to each named plaintiff.

14 (See Dkt. 104, Fees Motion at 21-22; Dkt. 90-1, Settlement Agreement at § X.1. (providing for

15 incentive payment of $500 for each class representative)).

16     In its order granting preliminary approval of the settlement, the court undertook a thorough

17 examination of the fairness and adequacy of the service awards at issue, applying the careful

18 scrutiny required in this Circuit. (See Dkt. 102, PAO at 23-24); see also Radcliffe v. Experian Info.

19 Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013) (instructing "district courts to scrutinize

20 carefully the awards so that they do not undermine the adequacy of the class representatives").

21 Based on its review of the record, the court determined that an award of $500 for each class

22 representative was presumptively reasonable and did not create a conflict of interest between

23 plaintiffs and absent class members. (See Dkt. 102, PAO at 24). The court therefore concludes

24

25  [11]  The court is satisfied that a "cross-check" using the percentage-of-recovery method is not

26 required.

27  [12]  Class counsel recognizes that litigation costs are part of the $750,000 in fees and costs

28 provided by the Settlement Agreement. (See Dkt. 104, Fees Motion at 20; Dkt. 90-1, Settlement Agreement at § X.1.).

1    that the requested service payments are fair and reasonable, and are hereby approved.

2                                        **CONCLUSION**

3          Based on the foregoing, IT IS ORDERED THAT:

4          1.  Plaintiffs' Motion for Final Approval of the Class Action Settlement **(Document No. 105)**

5    is **granted** as set forth herein.

6          2.  The court hereby **grants final approval** to the parties' Stipulation of Amended

7    Agreement and Settlement and Release ("Settlement Agreement") **(Document No. 90-1)**.  The

8    court finds that the Settlement Agreement is fair, adequate and reasonable, appears to be the

9    product of arm's-length and informed negotiations, and treats all members of the class fairly.  The

10   parties are ordered to perform their obligations pursuant to the terms of the Settlement Agreement

11   and this Order.

12         3.  Plaintiffs' Motion for Award of Attorneys' Fees, Expenses, and Service Awards for

13   Plaintiffs **(Document No. 104)** is **granted** as set forth herein.

14         4.  The settlement class is certified under Federal Rule of Civil Procedure 23(c):  All

15   cardholders, as identified in Green Dot Defendants' business records, who attempted to and were

16   unable to use their Green Dot-issued, MasterCard-processed cards to access or spend their

17   account funds from May 15, 2016 through May 22, 2016 as a result of the Service Disruption, who

18   did not properly and timely request exclusion pursuant to the procedures specified in the

19   Settlement Agreement.

20         5.  The form, manner, and content of the Class Notice meet the requirements of Federal

21   Rules of Civil Procedure 23(c)(2).

22         6.  Plaintiffs Jason Lewis, Danielle Hall, and Justin Thornton shall be paid a service

23   payment of $500 in accordance with the terms of the Settlement Agreement.

24         7.  Class counsel shall be paid $750,000.00 in attorney's fees and costs in accordance with

25   the terms of the Settlement Agreement.

26         8.  The court approves the designation of Consumer Action as the <u>cy pres</u> beneficiary

27   pursuant to the Settlement Agreement.

28         9.  All class members who did not validly and timely request exclusion from the settlement

have released their claims, as set forth in the Settlement Agreement, against any of the released parties (as defined in the Settlement Agreement).

10.  Except as to any class members who have validly and timely requested exclusion, this action is **dismissed with prejudice**, with all parties to bear their own fees and costs except as set forth herein and in the prior orders of the court.

11.  Without affecting the finality of this Order in any way, the court hereby retains jurisdiction over the parties, including class members, for the purpose of construing, enforcing, and administering the Order and Judgment, as well as the Settlement Agreement itself.

12.  Judgment shall be entered accordingly.

Dated this 22nd day of November, 2017.


                                                    /s/
                                        Fernando M. Olguin
                                        United States District Judge